# FILED

March 31 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA



DA 08-0443

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 97

IN THE MATTER OF
M.B., E.B., and B.B.,

Youths in Need of Care.

APPEAL FROM:   District Court of the Second Judicial District,
In and For the County of Silver Bow, Cause Nos. DN-2006-041,
DN-2006-042, and DN-2007-031
Honorable Brad Newman, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Nancy L. Rohde, Rohde Law & Associates, LLC, Billings, Montana

For Appellee:

Steve Bullock, Montana Attorney General, Matthew T. Cochenour,
Assistant Attorney General, Helena, Montana

Submitted on Briefs:  February 11, 2009

Decided:  March 31, 2009

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Appellants Roberta and Thomas Rawson (the Rawsons), Intervenors in these three consolidated causes of action, appeal from the final judgment and order of the Second Judicial District, Silver Bow County, denying Intervenors' motion for new trials or for amended judgments and denying Intervenors' motion to stay the judgments. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In December 2006, the Department of Public Health and Human Services (DPHHS) filed a petition for emergency protective services, adjudication as youths in need of care and temporary legal custody for two children, one-year-old E.B. and three-week-old M.B. In September 2007, DPHHS filed another such petition for four-day-old B.B. The first petition was based on a report that the mother tested positive for methadone when she gave birth to M.B. and the second was based on the mother's admitted drug use while pregnant with B.B. All three children were placed in foster care with the Rawsons, who live in Whitehall, Montana. E.B. was born in May 2005 and was nineteen months old when placed with the Rawsons, M.B. was born in November 2006 and was nineteen days old when placed with the Rawsons, and B.B. was born in November 2007 and was removed from his mother's care at birth and, after a month in the hospital, was placed with the Rawsons.

¶3 After the children were placed in temporary foster care with the Rawsons, DPHHS designed a number of treatment plans for the birth mother and birth father, which provided remedial services and rehabilitative programs, with the hope of eventually returning the children to their parents. Both parents repeatedly failed the treatment plans

2

and in April 2008, DPHHS filed a "Petition for Permanent Legal Custody and Termination of Parental Rights with Right to Consent to Adoption or Guardianship" for each of the three children. The parents then signed affidavits waiving all parental rights, relinquishing the children and consenting to adoption.

¶4 In May 2008, the Rawsons filed motions to intervene "to enable them to be heard for the purposes of permanency and placement" for the three children. The motions stated that "[i]mportantly, this matter involves an Indian Child as defined in the Indian Child Welfare Act (ICWA) of 1978 (25 U.S.C. chapter 21.). Accordingly, the parent[s'] wishes as to permanent, adoptive placement should be considered especially in this situation where a non-ICWA compliant home is being contemplated by DPHHS out of the state of Montana." The motion continued by stating it was the Rawsons' understanding "that both parents desire that [the children] remain with and be adopted by the foster family . . . ." The District Court granted the Rawsons' motion to intervene. The District Court held a termination hearing in June 2008, based on DPHHS' April 2008 petitions. Following the hearing the court entered findings of fact, conclusions of law and an order terminating the parental rights and granting DPHHS permanent legal custody of the children, with the right to consent to adoption or guardianship.

¶5 All three children are eligible for enrollment as members of the Little Shell Tribe of Chippewa Indians (Little Shell Tribe). The tribe is recognized in Montana but is not a federally recognized tribe. Their enrollment status is due to their father being an enrolled member of the Little Shell Tribe.

3

¶6      A DPHHS adoption selection committee, tasked with securing permanent adoptive placement of the three children, selected Doug and Trudie Nesbitt (the Nesbitts), a non-Indian family, in Spokane, Washington, as the best option for permanent placement. The committee determined that adoptive placement with the Nesbitts would more closely achieve the purposes and policies of ICWA than placement with the Rawsons because the Nesbitts are the adoptive parents of A.B. (now age 7), one of the children's full-blood siblings. The birth parents previously had their parental rights terminated on three children in the state of Washington and the Nesbitts adopted A.B. The two other full-blood birth siblings, A.B. (now age 5) and N.B. (now age 11) were adopted by another family who also live in Spokane, Washington. And, Spokane is where at least four paternal aunts and their children (natural cousins of this sibling group) reside and where the birth mother and birth father presently reside. The Nesbitts have developed and maintained, for the benefit of their adopted daughter A.B., a family-like relationship with the adoptive mother of N.B. and A.B.

¶7      After the termination hearing, the Rawsons filed a motion to continue the placement hearing. The motion stated, among other things, that the court had failed to comply with ICWA's requirement to notify the Little Shell Tribe of its rights to intervene in the proceedings. The motion stated there is "some concern with ICWA issues that could pose future problems." The Rawsons noted that they "did not intend or want undue delay in effectuating the permanency of these children" but that "it would be the children who would suffer the most ill effects of any challenge or invalidation of an adoption . . . ." The motion also pointed out that the standard of proof ICWA required for the

4

termination of parental rights is "beyond a reasonable doubt" rather than the "clear and convincing evidence" standard the court used. Based on the Rawson's motion the court held a supplemental hearing and applied the "beyond a reasonable doubt" standard and heard testimony from an ICWA expert. The District Court then again awarded DPHHS legal custody of the children.

¶8 In July 2008, the court held a hearing on the Rawson's motion for an order restraining DPHHS from removing M.B., E.B. and B.B. from their care and also on the issue of whether the Rawsons could demonstrate good cause to deviate from the adoptive placement preferences set forth in ICWA. The Rawsons presented a number of witnesses including an occupational therapist for the children, a family support specialist who has worked with the children, an ICWA qualified expert in the area of Indian culture, and testimony from foster mother Roberta Rawson. DPHHS presented testimony from a child protection specialist and an ICWA qualified expert in the area of Indian culture. The children's guardian ad litem was present and did not testify but submitted a report concerning placement. The court also noted that the Little Shell Tribe was given notice of the July 2008 hearing, as well as notice of numerous prior hearings, and that no representative of the Little Shell Tribe appeared or otherwise indicated an interest in having the tribe represented in these proceedings.

¶9 In August 2008, the District Court entered findings of fact, conclusions of law and an order concluding that the Nesbitts qualified as "extended family members" under ICWA, placing the children with the Nesbitts satisfied the purpose of ICWA and the Rawsons failed to show good cause to deviate from ICWA's preferred placements. The

Rawsons then filed motions for new trials or for amended judgments, and also for the court to stay the adoptive placement of the children, pending the disposition of their motions or any appeal in these matters. The District Court denied the Rawson's motions in September 2008 and held that DPHHS's "placement of the children with the proposed adoptive parents most closely meets the ICWA placement preferences." The court also stated that its August 2008 findings of fact and conclusions of law "support a determination that placement with the proposed adoptive parents is in the children's best interests, and allows the children the greatest opportunity for continued contact with their other full-blood birth siblings and extended family members." The Rawsons now appeal.

## ISSUES

¶10 The sole issue on appeal is whether the District Court abused its discretion when it approved DPHHS's adoptive placement of M.B., E.B. and B.B. with Doug and Trudie Nesbitt.[1]

## STANDARD OF REVIEW

¶11 The same standard of review applies to both termination of parental rights and custodial determinations. In both instances, the District Court's decision is afforded "all reasonable presumptions as to the correctness of the determination" and therefore such

---

[1] This case proceeded through the trial court as if ICWA applied. Indeed, the Rawsons pressed that argument on the District Court throughout these proceedings. The trial court's decision having not been to their liking, the Rawsons now raise for the first time on appeal a number of challenges to the application of ICWA in this case and various constitutional issues. We consistently refuse to consider theories or issues raised for the first time on appeal. *In re T.E.,* 2002 MT 195, ¶ 20, 311 Mont. 148, 54 P.3d 38. Moreover, a party waives the right to appeal an alleged error when the appealing party actively participated in the asserted error. *State v. Bomar,* 2008 MT 91, ¶ 33, 342 Mont. 281, 182 P.3d 47 (citation omitted). Accordingly, we decline to consider the Rawsons' ICWA or constitutional challenges.

6

decision will not be disturbed on appeal "unless there is a mistake of law or a finding of fact not supported by substantial credible evidence that would amount to a clear abuse of discretion." *Matter of S.P.*, 241 Mont. 190, 194, 786 P.2d 642, 644 (1990) (citation omitted). Our review for abuse of discretion is whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice. *In re T.S.B.*, 2008 MT 23, ¶ 17, 341 Mont. 204, 177 P.3d 429.

## DISCUSSION

¶12 ***Did the District Court abuse its discretion when it approved DPHHS's adoptive placement of M.B., E.B. and B.B. with Doug and Trudie Nesbitt?***

¶13 The Rawsons argue the District Court erred when it found there was not substantial credible evidence to show "good cause" to deviate from the adoptive placement preferences as set forth in ICWA. The Rawsons also argue the District Court's conclusions of law were incorrect. More specifically, the Rawsons argue they meet all three factors in the Bureau of Indian Affairs (BIA) guidelines that demonstrate a "good cause" exception to the adoptive placement preferences set forth in ICWA. First, the Rawsons argue the District Court should have deviated from the placement preferences because "both biological parents indicated directly to the district court their desires to have their three children remain with the Rawson[s]." They also maintain that the State's argument that it was not appropriate for the court to consider the parents' wishes in this case, was based on the BIA guidelines being "taken out of context." Second, the Rawsons argue the District Court abused its discretion when it did not

7

consider the physical or emotional needs of the children.  Third, the Rawsons argue the District Court erred in its legal conclusion that ICWA defines "extended family" as adult persons who have adopted other siblings.

¶14    DPHHS asserts that "[s]ubstantial credible evidence supports the district court's findings" and DPHHS urges this Court to affirm the placement of the children with the Nesbitts.  DPHHS argues that the "good cause" exceptions in the BIA guidelines do not apply because  the exception regarding the request of the biological parents  "is inapplicable in this case and provides no grounds to deviate from ICWA's placement preferences."   Furthermore, DPHHS argues that the exception regarding the children's extraordinary physical or emotional needs does not apply because "the witnesses' testimony does not indicate that the children have 'extraordinary physical or emotional needs' that require 'highly specialized treatment.' "   Finally DPHHS claims that "[c]ontrary to the [Rawsons'] assertion, the court's conclusion that the [Nesbitts] qualified as 'extended family members' does not amount to a new definition of extended family."

¶15    The policies behind the passage of ICWA include the finding that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest . . . in protecting Indian children who are members of or are eligible for membership in an Indian tribe . . . ." 25 U.S.C. § 1901(3).  Also, "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and [] an alarmingly high percentage of such children are placed in non-

Indian foster and adoptive homes and institutions . . . ." 25 U.S.C. § 1901(4).

Furthermore, Congress declared the following:

> [I]t is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .

25 U.S.C. § 1902. To implement these policies, ICWA establishes a preferred order for the adoptive placement of an Indian child, based on the presumption that following the preferred placement order is in the best interest of the child. A court must follow the preferred order unless it concludes good cause exists to deviate from the preferences. 25 U.S.C. § 1915(a). ICWA mandates that "[i]n any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a)(1)-(3).

¶16 Following the passage of ICWA, the BIA promulgated guidelines to assist state courts in the interpretation and application of ICWA. 44 Fed. Reg. 67,584-67,595 (Nov. 26, 1979). This Court has determined these guidelines are persuasive and that we apply them when interpreting ICWA. *In re C.H.*, 2000 MT 64, ¶ 12, 299 Mont. 62, 997 P.2d 776 (citations omitted). According to the guidelines, a party asking a court to deviate from the preferred placement order above has the burden of showing good cause exists to justify the deviation. 44 Fed. Reg. at 67,594. As explained in the guidelines, a

determination of good cause shall be based on one or more of the following considerations: "(i) [t]he request of the biological parents . . . (ii) [t]he extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness, (iii) [t]he unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria." 44 Fed. Reg. at 67,594, Fn. 3.

¶17    The Rawsons make three separate arguments as to why ICWA's adoptive placement preferences should not be followed. We will address each in turn. First, the Rawsons argue that the first of the criteria for establishing good cause is met because "both biological parents indicated directly to the district court their desires to have their three children remain with the Rawson[s]." The text in the Federal Register contains a footnote with commentary elaborating on the three "good cause exceptions." In reference to the first exception, the footnote reads: "[p]aragraph (i) is intended to permit parents to ask that the order of preference not be followed because it would prejudice confidentiality or for other reasons." 44 Fed. Reg. at 67,594, Fn. 3. This text indicates the purpose of this exception is to protect the biological parents' confidentiality, if they so choose. In this case, the biological parents were not seeking to protect their confidentiality. The Rawsons interpret the language "the request of the biological parents" to mean that their request that the children be placed with the Rawsons should be considered in determining good cause. This interpretation, however, does not fit within the plain language contained in the guidelines. Thus, this exception does not apply, and the Rawsons did not argue any "other reasons."

¶18 Second, the Rawsons argue the District Court "abused its discretion when it did not consider the physical or emotional needs of the children." In support of this assertion, they point to testimony by the occupational therapist and family support specialist who had worked with the children. The Rawsons assert these specialists "expressed concerns about potential problems with developmental delays and emotional harm with long term consequences to each child" based on "the children's emotional and developmental set backs and delays they witnessed each time the children were returned from a visit with the Nesbitts." The BIA guidelines specify that the second exception applies "[i]n a few cases [where] a child may need highly specialized treatment services that are unavailable in the community where the families who meet the preference criteria live" and the guidelines recommend that "such considerations be considered as good cause . . . ." 44 Fed. Reg. at 67,594, Fn. 3. This Court has held that, absent testimony showing it is *certain* that a child will experience trauma from a transfer of custody or develop an attachment disorder, "[t]he risk that a child might develop such problems in the future is simply too nebulous and speculative a standard on which to determine that good cause exists to avoid the ICWA placement preferences." *C.H.*, ¶¶ 26-27.

¶19 In this case, the testimony of both the occupational therapist and the family support therapist indicated that overall the children were doing well. The occupational therapist had "terminate[d] services" to the children unless something came up and she agreed that the "kids are doing pretty well." The family support therapist said that E.B. has made "great gains," M.B. is "doing great now" and no longer qualifies for her

11

services, and B.B. still receives some therapy to help with his motor skills, but his other skills have developed well.

¶20    While the therapists spoke to the gains the children had made, both expressed concerns about possible regression if the children were moved to a different home and were required to begin anew with forming trust bonds with caregivers. They based these concerns on their observations of the children after they had returned from visits to the Nesbitts. The occupational therapist testified that when she met with E.B. after such visits, E.B. exhibited "severe tantrums," had "regressed in all of her motor skills and in her sensory issues, was not able to self-regulate, was a very angry child, at times became mute . . . ." The occupational therapist noted M.B. showed "[v]ery clingy behavior" and that in general the children exhibited "clinginess" and "anger" and an "inability to self-regulate and feel safe." She also concluded that her ongoing concern was with "consistency." The family support therapist indicated her concerns about the children, E.B. in particular, being removed from the Rawsons' care because she is "concerned about disrupting this bond that [E.B.] has created that's very strong with [the Rawsons], and that that could cause regression in so many of those skill areas" that she has worked on with E.B. And, with M.B. and B.B. she is concerned because "they have created a bond and they're young, and if that bond was broken, then exhibiting similar characteristics [as E.B. did when she first began working with the therapists]."

¶21    While the concerns expressed by the therapists certainly show potential impacts on the children if ICWA's placement preferences are followed, these needs do not rise to the level of "extraordinary physical or emotional needs" requiring "highly specialized

treatment services that are unavailable in the community where the families who meet the preference criteria live," which, according to the guidelines, is what is required to demonstrate good cause to deviate from the preferences.

¶22 Third, the Rawsons did not address the third good cause exception but argue the District Court erred in its legal conclusion that ICWA's definition of "extended family" includes adult persons who have adopted other siblings. The Rawsons assert that "[s]ibling connections are important but they do not rise to making new definitions of extended family." ICWA states that an " 'extended family member' shall be as defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent . . . ." 25 U.S.C. § 1903(2).

¶23 The District Court made the following conclusion of law: "[a]bsent case law to the contrary, and in light of the testimony of the Little Shell Tribe ICWA expert witness, it is reasonable and logical to conclude that the adoptive parents of a Little Shell Indian child's full-blood birth sibling qualify as 'extended family members' within the meaning of the Act." Before the District Court made this conclusion, each side presented testimony from a qualified ICWA expert as to the interpretation of the definition of "extended family member." The witness for the Rawsons testified that, in her knowledge of ICWA as well as tribal culture, the Nesbitts would not fall under the definition of "extended family member" in ICWA. She testified that even though sibling relationships are important, that doesn't mean all the siblings have to be in the same home. She also

13

indicated that it was preferable for the children to be closer to their own tribal heritage in Montana rather than being placed in Washington. The witness for DPHHS, a member of the Little Shell Tribe, was asked whether "a group of siblings, a sibling unit, is an important group in a child's life" and she testified "[v]ery much so, yes." She also testified that in the Little Shell culture, the tribe "would consider other persons as extended family" beyond the list contained within ICWA's definition of "extended family member." She concluded that placement with the Nesbitts "would be the best placement for the children . . . because they need to be with their siblings. They need to grow up together."

¶24 The District Court determined this testimony was sufficient to support the conclusion that the Nesbitts would be considered "extended family member[s]" under ICWA. Absent caselaw to the contrary and because we afford a district court's decision "all reasonable presumptions as to the correctness of the determination" we agree there exists substantial credible evidence to determine the Nesbitts fit within ICWA's definition of "extended family member."

## CONCLUSION

¶25 The District Court did not abuse its discretion in determining good cause did not exist to deviate from the placement preferences in ICWA and in placing the children with the Nesbitts. The District Court's findings and conclusions were supported by substantial credible evidence that there was not good cause to deviate from ICWA's placement preferences or to conclude the Nesbitts did not fit into the definition of "extended family member" as contemplated by ICWA.

¶26    Affirmed.


                                        /S/ JAMES C. NELSON


We Concur:

/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS