Submitted July 24, affirmed September 27, 2023

In the Matter of B. P.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

R. F.
and M. F.,
*Appellants.*

Clackamas County Circuit Court
19JU08136; A180340

538 P3d 577

Appellants R. F. and M. F. appeal the juvenile court's denial of their motion to intervene in Child's dependency case. Child is an enrolled member of the Oglala Sioux Tribe (tribe) and is an Indian child within the meaning of the Oregon Indian Child Welfare Act (ORICWA) and the federal Indian Child Welfare Act (ICWA). Child is represented by legal counsel and has a court-appointed special advocate (CASA). DHS placed Child with appellants shortly after birth because, while not members of a tribe, they are adoptive parents of Child's cousins. DHS later placed Child with another family, the Ls, because a representative of Child's tribe informed the agency that the tribe did not view appellants as relatives under ICWA. After appellants moved to intervene in the case under ORS 419.116, the tribe reversed its position. DHS requested a home study for appellants that would be provided to the tribe pursuant to ORICWA and ICWA so that the tribe could make an updated recommendation on Child's placement. The home study was still ongoing at the time of the hearing on appellants' motion. The juvenile court denied appellants' motion to intervene because it was not persuaded, by a preponderance of the evidence, that the existing parties could not adequately present the case. *Held*: The juvenile court did not err in denying appellants' motion to intervene. No party requested *de novo* review, so the court reviewed to determine whether the record supported the juvenile court's determination. Under that standard of review, the record supports the juvenile court's conclusion that appellants failed to meet their burden to prove, by a preponderance of the evidence, that the existing parties could not adequately present the case. In particular, because, at the time of the motion to intervene, it was not yet known who the existing parties would argue should be the Child's preferred placement under ICWA, the juvenile court was not compelled to find that existing parties could not adequately present the case regarding Child's proper placement under ICWA. The Court of Appeals noted the possibility that intervention may need to be allowed, in the event that no party presented the case that appellants constituted the preferred placement.

Affirmed.

Todd L. Van Rysselberghe, Judge.

Aron Perez-Selsky filed the brief for appellants.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent.

Before Mooney, Presiding Judge, and Lagesen, Chief Judge, and Armstrong, Senior Judge.

LAGESEN, C. J.

Affirmed.

Mooney, J., dissenting.

**LAGESEN, C. J.**

Pursuant to ORS 419B.116, appellants R. F. and M. F. (collectively, the "Fs") moved to intervene in this juvenile dependency case regarding three-year-old B. B is an enrolled member of the Oglala Sioux Tribe (the tribe), making this case subject to the Indian Child Welfare Act of 1975 (ICWA), 25 USC sections 1901-1963, as well as to the Oregon Indian Child Welfare Act (ORICWA), ORS 419B.600 to 419B.665. In a previous dependency case, R. F. and M. F. served as B's foster parents for 22 months, until B was reunified with her mother. After the Department of Human Services (DHS) removed B from her mother's care for a second time and placed her with a different set of foster parents in this case, R. F. and M. F. sought to intervene for the purpose of having the juvenile court direct that B be placed with them again. The juvenile court denied the motion. It determined that appellants failed to show, as required by ORS 419B.116(5)(c)(D), that the existing parties could not adequately present the case. We affirm.

The relevant historical facts are not disputed. After B was removed from her mother's care shortly after her birth in 2019, B was placed with R. F. and M. F., who are the adoptive parents of B's cousins. At the time, although neither R. F. nor M. F. is a tribal member, DHS viewed them to be relatives of B for purposes of ICWA. The Fs cared for B for 22 months, at which point B was returned to her mother. Thereafter, Fs continued to provide respite care for B.

About seven months after B was returned to mother, DHS again removed her from her mother's care and initiated the present dependency case. Instead of placing B with appellants again, DHS placed her with the Ls after having been informed by a representative of the tribe that it did not view Fs to be relatives of B for purpose of ICWA. DHS placed B with the Ls because of their membership in the Cherokee tribe, which made them a preferred placement under ICWA. One of the Ls is a Multnomah County Circuit Court judge.

R. F. and M. F. then moved to intervene in this case, for the purposes of requesting that B be placed with them. At the request of DHS, the case was transferred to

Clackamas County Circuit Court from Multnomah County Circuit Court because of the potential conflict created by the fact that one of the Ls serves as a judge of that court. Shortly thereafter, the tribe reversed positions and determined that R. F. and M. F. qualified as a relative placement, making them a preferred placement under ICWA, although the tribe "indicated to [DHS] that there was good cause to have the child placed in the home that the child was currently placed in[,] the tribal home." At that point, DHS requested a home study for R. F. and M. F., which it would provide to the tribe so that the tribe could make an updated recommendation regarding placement. That process was in progress at the time of the hearing on the motion to intervene.

At the hearing, the trial court heard testimony from M. F., R. F., and two DHS workers involved with B's case. In closing, the Fs argued that they met the statutory standard for intervention. Addressing the requirement that they demonstrate that the existing parties could not adequately litigate the case, they argued that "with all due respect to all of the parties in this court and the attorneys in this courtroom, there are certain professional and institutional restrictions that will limit their ability to adequately present this case," given that one of the Ls was a judge. DHS, B's court-appointed special advocate (CASA), and B—through her attorney—all opposed the motion. The trial court ultimately denied it, focusing on the fact that it was not persuaded that the existing parties could not adequately present the case:

> "The [Fs] established that they are able to act in [B's] best interest as caregivers. However, the statute requires more. Proof of acting in [B's] best interest, even when the caregivers are highly dedicated and nurturing like the [Fs], is not enough to meet the second prong of the statutory analysis. The statute requires proof that their intervention is in [B's] best interest, which poses a bigger question because intervention entails party status.

> "The court is not convinced, by a preponderance of the evidence, that the existing parties cannot adequately present the case. The professional resources allocated to [B's] case are sufficient without promoting the [Fs] to party status.

> "Furthermore, there is no proof that the efforts of the professionals will be compromised in any way due to the occupation of [B's] current resource caregiver. Any conclusion otherwise would require speculation, and therefore the law requires the Court to deny the motion."

On appeal, the Fs assign error to the juvenile court's denial of their motion to intervene, contending that it erred in determining that they had not proved that they met the statutory requirements. The Fs have not requested us to review *de novo*. We therefore review to determine whether, on the record before it, the juvenile court permissibly concluded that they had not met their burden of demonstrating that they satisfied the statutory prerequisites for intervention. *Dept. of Human Services v. S. E. K. H./J. K. H.*, 283 Or App 703, 705-06, 389 P3d 1181 (2017) (articulating standard of review applicable to factual determinations by the juvenile court when the Court of Appeals does not engage in *de novo* review). As we explain, that standard of review requires us to affirm the trial court's ruling.

ORS 419B.116 confers discretion on a juvenile court to allow intervention in a dependency case by a person who has a "caregiver relationship" with a child, as that term is defined by statute. ORS 419B.116(5)(c). The court may exercise that discretion only if the person seeking intervention first "proves by a preponderance of the evidence" a range of factors, including that "[t]he existing parties cannot adequately present the case." *Id.* Here, the juvenile court found that the Fs had not proven, by a preponderance of the evidence, that the existing parties could not adequately present the case. Under our standard of review, that finding binds us on appeal because the evidence before the court did not compel a contrary conclusion: "Unless the evidence in a case is such that the trial court as finder of fact could decide a particular factual question in only one way, we are bound by the trial court's factual findings, including a finding that a party's evidence is not sufficiently persuasive." *Prime Properties, Inc. v. Leahy*, 234 Or App 439, 449, 228 P3d 617 (2010) (internal quotation marks and brackets omitted). In fact, the record affirmatively supports the conclusion that the existing parties could adequately litigate the case and, in particular, would ultimately present the case for what

would be in B's best interest. On cross-examination, M. F. acknowledged that there was nothing that caused her to think that B's lawyer "can't adequately present this case on behalf of" B.

Before us, R. F. and M. F. nonetheless argue for a contrary conclusion. They first point to the fact that neither B's lawyer nor B's CASA objected to B's placement with the Ls as demonstrating that B's interests were not represented. But, as noted, at the time of placement, the tribe had communicated that it did not view the Fs as a relative placement for purposes of ICWA, making it difficult to infer from the failure to object that B's lawyer and her CASA could not adequately present the case.

The Fs also stated that "there was a reasonable probability that the decision-making capacity of [B's] attorney, mother's attorney and the attorney for DHS with respect to [B's] case would be materially limited by the professional obligations to other clients in matters heard by" the resource parent who was a judge. They suggest that the potential "need to investigate, subpoena, examine, cross-examine, or impeach" the judge and spouse compels the conclusion that the other parties to the case could not adequately present it because they would be concerned about potential ramifications in future cases before the resource parent.

The concern raised by the Fs is not unreasonable. That is, it is not unreasonable for them to fear that the judicial status of one of the resource parents could influence the behavior of the other parties to the case in a way that could affect their presentation of it. But, as the juvenile court correctly recognized, ORS 419B.116(5)(c) requires that potential intervenors demonstrate not just that there is a risk that "the existing parties cannot adequately present the case," it requires a showing by a preponderance of the evidence—meaning that it is more likely than not—that the existing parties cannot adequately present the case. *See Riley Hill General Contractor, Inc. v. Tandy Corp.*, 303 Or 390, 402, 737 P2d 595 (1987) (explaining that proof by "a preponderance of the evidence" sets a more likely than not standard). This record is not one that would compel a finding that the Fs satisfied their burden of

proof. Accordingly, the Fs have not demonstrated that the juvenile court committed reversible error when it denied the motion to intervene.

Our conclusion that the juvenile court did not err in denying the motion to intervene on the record before it should not be understood to conclusively resolve the issue of whether the Fs should be permitted to intervene in this case. As noted, and central to our assessment of the juvenile court's ruling, at the time the court ruled on the motion, DHS was still in the process of working with the tribe to assess the appropriate placement for B under ICWA. *See* 25 USC § 1915(c) (child's tribe may establish placement preferences for child); *see also* ORS 419B.654 (providing the same). As the Fs point out on appeal, they may qualify as B's "extended family," and, as such, the preferred foster and, if necessary, adoptive placement for B under ICWA, absent proof of "good cause" for a different placement. *See* 25 USC § 1915 (a) and (b) (providing preference for placement with a member of a child's "extended family"); ORS 419B.654 (same); *see also In re M. B.*, 350 Mont 76, 85, 204 P3d 1242, 1248 (2009) (upholding trial court's determination, based on testimony by tribal expert, that adoptive parents of an Indian child's siblings qualified as "extended family" under ICWA).[1] Should this case ultimately require the juvenile court to determine whether the Fs qualify as B's extended family under tribal law or custom, or whether good cause exists to depart from the ICWA preference for placement with the Fs, if they do qualify as extended family, the juvenile court may need to permit the Fs to intervene if no existing party takes the position that they are the appropriate

---

[1] ICWA states that the phrase

"'extended family member' shall be defined by the law or custom of the Indian child's tribe or, in the absence of such a law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin or stepparent[.]"

25 USC § 1903(2). ORICWA defines "extended family member" almost identically, providing, in addition to the persons listed in ICWA that "extended family member" also includes persons "as determined by the Indian child's tribe, clan or band member." ORS 419B.603(3)(b). Thus, the question whether the Fs are B's extended family under ICWA and ORICWA turns on whether they qualify as extended family members under tribal law and custom, a question that cannot be resolved without the tribe's input and, possibly, the assistance of a tribal expert.

placement under ICWA.[2] To ensure that the case regarding the appropriate placement for B is presented adequately, the position that the Fs are the appropriate placement must be developed fully and fairly.

The dissenting opinion reaches a different conclusion than we do and would reverse with directions to the juvenile court to grant the motion to intervene. 328 Or App at 282 (Mooney, J., dissenting). The dissenting opinion does so by concluding that this is an exceptional case and that the court should exercise its discretion to review *de novo* and decide the motion to intervene ourselves. 328 Or App at 275 (Mooney, J., dissenting). As we have explained,

> "when we review *de novo*, we are not performing our more typical appellate-court function of assessing whether the evidence before a trial court was legally sufficient to support its ruling. Rather, we are deciding for ourselves whether the case made by the party with the burden of persuasion persuades us that the party has proven its case."

*Dept. of Human Services v. L. M. B.*, 321 Or App 50, 52, 515 P3d 927 (2022).

The primary difficulty we have exercising discretion to review *de novo* in this case is that the Fs did not request *de novo* review. Our rules contemplate that an appellant seeking *de novo* review will make a request for it and "shall concisely state the reasons why the court should do so." ORAP 5.40(8)(a). The requirement for a request operates to put the respondent on notice of the possibility that the court will review *de novo* and of the reasons why that might be an appropriate approach. The requirement of the request gives the respondent a fair opportunity to address

---

[2] We note that in *M. B.*, the Montana Supreme Court confronted a case presenting issues similar to those here. One issue was whether a non-Indian couple qualified as Indian children's extended family under ICWA by virtue of the couple's adoption of the children's sibling. *M. B.*, 350 Mont at 78, 84-85, 204 P3d at 1243-44, 1247-48. The children's foster parents were permitted to intervene to contest, among other things, that the adoptive parents of the children's sibling qualified as extended family members. *Id.* at 77-78, 204 P3d at 1243-44. Qualified ICWA experts presented competing testimony on the issue, and the trial court ultimately credited the testimony that, in the tribe's culture, the adoptive parents of the siblings were extended family members. *Id.* at 84-85, 204 P3d at 1247-48. *M. B.* illustrates circumstances in which a juvenile court might need to permit intervention to ensure that genuine disputes about an Indian child's placement under ICWA are resolved in a full and fair way.

the asserted reasons for *de novo* review and to craft responding arguments that account for the possibility that the court will review *de novo*. The deprivation of this opportunity is significant because, as noted, *de novo* review requires us to perform a much different function than when we review for evidentiary sufficiency. For that reason, although we do not doubt our authority to review *de novo* absent a request, doing so gives us pause.

Further, the circumstances here do not overcome that pause. Because the parties did not seek *de novo* review, the parties have not had the opportunity to address some of the considerations that animate the dissenting opinion. In our view, in the absence of a request for *de novo* review and full input from the parties on them, those considerations are more appropriately taken into account on a renewed motion for intervention, if the issue of B's placement remains in dispute once B's tribe weighs in on the question whether the Fs qualify as extended family members under tribal law and custom.

In sum, applying our usual standard of review, on this record, the juvenile court permissibly concluded that the Fs had not demonstrated that they satisfied the criteria for intervention. As noted, this conclusion does not foreclose the Fs seeking to intervene should it become clear that no existing party will present the case that the Fs are the proper placement for B under ICWA.

Affirmed.

**MOONEY, P. J.,** dissenting.

I do not view the record as the majority does and, because of that, I respectfully dissent.

Although not requested, I would vote to exercise our discretion under ORS 19.415(3)(b) and ORAP 5.40(8)(c) to review this matter on a *de novo* basis. This is an exceptional case that concerns the welfare of an Indian child, B, who was previously made a ward of the juvenile court, whose mother has since died, and who has no legal father. The representatives of B's tribe, the Oglala Sioux, have not provided clear direction about tribal placement preferences, leading to an

abrupt change in foster care placement after an unsuccessful and traumatic attempt at reunification between B and her mother. Rather than placing B back with the moving parties (appellants), with whom B had lived since birth and to whom she was well-bonded—a family that included B's first cousins who are enrolled members of the Oglala Sioux—she was instead placed with foster parents she had never met, one of whom was, at the time of placement, a juvenile court judge in the judicial district exercising jurisdiction over B. The majority does not "doubt our authority to review *de novo* absent a request," 328 Or App at 275, and while we rarely do so, we should conduct *de novo* review here.

Raising a child is no small task, even under the best of circumstances. B was made a ward of the court because her "circumstances [were] such as to endanger [her] welfare." ORS 419B.100(1)(c). Those circumstances complicated things, requiring the involvement of the juvenile court, DHS, B's tribe, CASAs, and foster parents. The juvenile court's role is, generally, to apply "a series of complex statutes and proceedings" to the facts of B's circumstances in order to protect her safety, well-being, and rights. *Dept. of Human Services v. F. J. M.*, 370 Or 434, 441, 520 P3d 854 (2022) (internal quotation marks and citations omitted).

In general, the juvenile court specifies "the particular type of care, supervision or services to be provided by [DHS] *** but the actual planning and provision of such care, supervision or services is the responsibility of [DHS]." ORS 419B.337(2). In cases like this one, where the child is an Indian child within the meaning of the Oregon Indian Child Welfare Act (ORICWA) and the federal Indian Child Welfare Act (ICWA), the court plays a more active role in ensuring that specific foster care placements are made in compliance with those Acts. ORS 419B.654(1), for example, requires that when parental rights have not yet been terminated, Indian children are to be placed in the "least restrictive setting" that (a) "most closely approximates a family," (b) provides for any special needs to be met, (c) "is in reasonable proximity to the Indian child's home, extended family or siblings," and (d)(A) is "in accordance with the order of preference established by the Indian child's tribe[.]" Indian

children must be placed within the tribe's particular order of preference unless the court finds good cause to deviate from that order following an evidentiary hearing. 25 USC § 1915(b); ORS 419B.654(1)(d)(A); *DHS v. Three Affiliated Tribes of Fort Berthold*, 236 Or App 535, 548, 238 P3d 40 (2010).

B was placed in the home of appellants within days of her birth in the fall of 2019. Less than two months later, the juvenile court found B to be within its jurisdiction after finding by clear and convincing evidence that (1) ORICWA and ICWA apply, (2) custody of B by her mother was "likely to result in serious emotional or physical damage to [B]," and (3) B's placement with appellants complied with "the placement preferences established by 25 USC § 1915." Those findings were based upon the sworn testimony and written declaration of a tribal representative, who testified that, among other things, placement with the appellants was "ideal" because it included B's first cousins who are "native" and because cousins often grow up together in the "tribal family system." The tribal representative further stated that appellants' family structure is "extremely positive for [B]" and "promote[s] socialization in a very traditional way * * *." Placement with appellants was characterized by the court as "relative foster care (placed in her cousins' home)." B spent the first two years of her life with appellants, and she developed strong family bonds with them. They were the only family and home B had ever known and she did very well there.

B's birth mother worked successfully toward sobriety, and, because of that, she was given an opportunity to have B in her home. B was in her mother's care for six or seven months, but reunification was not successful, and B was removed and placed back into foster care.[1] Although appellants had continued to see B and to provide respite care for her during the attempt at reunification, B was not placed with them when she was removed from her mother's home. She was, instead, placed with another family (the current foster family), strangers to her, after a different

---

[1] B's mother died at some point after reunification failed.

tribal representative informed DHS that the tribe did not view appellants to be a relative placement.

Neither appellants nor the current foster family include B's "extended family member[s]," at least not as defined by ORICWA and ICWA.[2] The foster mother in each family claims tribal heritage, but not to the Oglala Sioux. The current foster mother is an enrolled member of the Cherokee tribe. The appellant foster-mother is not enrolled in a tribe. B's tribe has given mixed messages to DHS about appellants' status as a relative placement, but when advised by the tribe's attorney that an exception to tribal placement preferences would, in fact, be needed to support placement with the current foster family, DHS disagreed and did not seek an exception from the juvenile court. Thus, the issue of which placement would best serve B's interests was not brought to the juvenile court's attention.

When B was placed with appellants, appellant-foster-mother's connection to two other tribes together with B's cousins' connection to the Oglala Sioux tribe was said to be consistent with tribal preferences. The first tribal representative gave sworn testimony to that effect. DHS acknowledges that the two tribal representatives took "inconsistent positions" on the tribe's placement preference for B. But it is not up to DHS, the juvenile court, or us to divine the tribe's position on tribal matters. There is a process for persons who qualify as tribal experts to provide input both informally and through sworn testimony. Given that B's cousins are blood relatives who are enrolled members of B's tribe, and that B spent the first two years of her life living with

---

[2] Under ICWA and ORICWA, extended family members of the Indian child enjoy a place on the hierarchy of preferences for foster care placement. 25 USC § 1915(b)(i); ORS 419B.654(1)(d)(B)(i). Both acts define the term "extended family member" to include, among others, first and second cousins who have reached the age of 18. *See* 25 USC § 1903(2) ("a person who has reached the age of eighteen"); ORS 419B.603(3)(b) ("a person who has attained 18 years of age"). Appellants adopted B's first cousins, but those cousins are not yet 18 and, therefore, do not qualify as extended family. DHS relies upon that point and urges that "to the extent appellants believe that it is necessary for them to intervene to protect [B's] best interests because the juvenile court and the existing parties are failing to comply with the requirements of ICWA/ORICWA, they are mistaken." That argument overlooks the fact that B and her cousins are blood relatives whose relationship to each other has necessarily developed like that of siblings.

them as family, it would have been especially important for that established process to be followed here.

It may be true that B's cousins do not now qualify as B's "extended family" because of their age and, certainly, B could not be placed with her cousins because they are not yet adults and could not serve as her foster parents. But, as already mentioned, ICWA and ORICWA require placement in a setting that most approximates family, with particular emphasis on preserving sibling relationships and tribal connections. The only sworn testimony on the topic is that cousins often grow up together in the "tribal family system."

When DHS decided B's current placement, the juvenile court was not presented with an argument that placement with appellants continued to be in B's best interest because it would have preserved B's connection with her own tribe through her first cousins' membership in that tribe. The court was not advised that, by placing B with strangers in a new home, it would disrupt her connection to her cousins who will, at some point, qualify as her extended family. Given the disruption in B's life caused by the failed attempt at reunification with her mother, and B's life-long experience with appellants as her family, it was important that the juvenile court be presented with appellants' arguments as to why B should be placed with them. It is especially important that the juvenile court hear those arguments now that B's birth mother is deceased and there is no legal father.

Intervention may be ordered in a juvenile dependency case following a hearing upon proof by a preponderance of the evidence (1) of a caregiver relationship between the moving party and the ward, (2) that intervention is in the ward's best interests, (3) the reason for intervention and the relief sought are consistent with the ward's best interests, and (4) the "existing parties cannot adequately present the case." ORS 419B.116(5)(c)(A) - (D). No party disputes that appellants have a caregiver relationship with B. The parties focus their arguments instead on whether the existing parties can adequately present the case.

DHS filed a motion to transfer jurisdiction to Clackamas County shortly after the motion to intervene was

filed "due to the current resource parent being an employee of the Multnomah County judicial department." The motion was granted, and DHS filed its objection to the motion to intervene. After a number of procedural events, including at least one Clackamas County judge removing herself from further involvement in the case, there was a hearing on the motion.

The record contains this testimony from appellant-foster-father:

"[COUNSEL FOR APPELLANTS]:

"Q  \*\*\* have the resource parents been present at the—with their attorney at these hearings on our motion to intervene?

"A   Yes.

"Q   Okay. So [DHS] testified that one of the [current foster] parents is a Multnomah County Circuit Court judge and that [the attorneys of record in this case] are all—all practice in Multnomah County. Correct?

"A   Correct.

"Q   What concerns do you have about the ability of these attorneys to present this case—

"[COUNSEL FOR DHS]:   Objection. Relevancy. I am not sure how, with all due respect, [appellant] is able to talk about that. If there is a concern regarding the ability of counsel to be impartial, then I think that that's something that the attorney can argue, but asking the witness—I think it's well beyond a lay person and well beyond sort of the appropriate question to ask.

"THE COURT:   I'm going to overrule the objection. He can testify if that's his concern and then—but counsel's welcome to—I'd invite counsel to, if it's appropriate, to, you know, argue the point.

"[COUNSEL FOR APPELLANTS]:

"Q  \*\*\* [A]gain, what concerns do you have, if any, of the ability of the attorneys that I named to adequately present this case given the status of the—one of the [current foster] parents and the profession that these attorneys are part of—

"A   Sure.

"Q   —and where they work?

"A   Sure. No, I would personally, from mere logical per-spective, have concerns that if one of the attorneys present in this case were to appear future—in a future hearing—unrelated hearing—that I believe it could sway an opinion or the approach to remove a child from a judge's home if they're going to have to appear before that judge in a dif-ferent hearing."

Appellants were, thus, concerned that the current foster mother's position as a judge might give her an unfair advantage in the continued placement of B in her home. B's case was transferred to a different judicial district precisely to avoid such concerns. But the judge/foster mother attended the hearing. To be sure, as a foster parent, she was enti-tled to notice, and she was entitled to attend the hearing. I assume that she attended in good faith as B's foster mother. But her presence in the courtroom did not go unnoticed, and everyone involved in that hearing knew that the case had been transferred to that courthouse to avoid the appearance of impropriety related to the current foster mother's role as a judge. It should not have been a surprise to anyone that her presence in the courtroom while testimony was taken and while the juvenile court made its ruling presented an appearance of impropriety, at least for appellants. Even the majority acknowledges that "it is not unreasonable for [appellants] to fear that the judicial status" of the current foster mother "could influence" how the case is presented to the juvenile court. 328 Or App at 272.

The juvenile court made this finding, among others, when it denied the motion to intervene:

"[T]here is no proof that the efforts of the professionals will be compromised in any way due to the occupation of [B]'s current resource caregiver. Any conclusion otherwise would require speculation, and therefore the law requires the Court to deny the motion."

But it was not appellants' burden to prove improper influ-ence or duress to prevail on their motion. They raised the concern that their role in B's life and their suitability for her continued or future placement would not be presented by the

existing parties because the attorneys and DHS casework-
ers appear in the current foster mother's courtroom on other
matters. In other words, appellants believed it unlikely that
the existing parties would present them as a suitable place-
ment option for B when the other choice is the juvenile court
judge sitting in the back of the courtroom. DHS opposed
intervention and supported placement with the current
foster family. It did not present appellants as a placement
choice for the court to consider after reunification with B's
mother failed. That record supports the conclusion that the
existing parties either cannot or will not adequately present
the case for decision.[3] That is what appellants were required
to establish.

The majority suggests that appellants take a wait-
and-see approach. They could certainly do that. But this
is not the time to watch the wheels of justice slowly turn.
All too often, the imminent need to address a child's living
situation is overtaken by the passage of time, which then
becomes the reason to leave things as they are. That pas-
sage of time in a dependency case becomes the thing that
is most sharply debated on questions of placement and case
planning. Disruptions in a child's life are part and parcel
of the dependency process and they are often traumatiz-
ing. While an old-fashioned tincture of time may be good
medicine for many situations, it is not the remedy called for
here. The emotional and financial costs of litigation present
formidable barriers to participation, especially after losing
the first time. I would reverse and remand this case to the
juvenile court with direction to allow intervention.

---

[3] The majority notes that B opposed the motion to intervene through her
attorney. B is little more than a toddler, and there is no evidence or suggestion
that she expressed a preference to be placed with strangers. Moreover, her attor-
ney, like the other attorneys, appears before the current foster mother in her
courtroom on other matters. Those facts weigh in favor of intervention.