No. 107          February 22, 2024          1

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of X. E. W., a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

X. E. W.,
*Appellant.*

Jefferson County Circuit Court
15JU04613; A176848

Annette C. Hillman, Judge.

Submitted November 30, 2022.

Ginger Fitch and Youth, Rights & Justice filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Timothy A. Sylwester, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Reversed.

**ORTEGA, P. J.**

In this juvenile delinquency appeal, youth assigns error to the juvenile court's denial of his petition for relief from registration as a sex offender under ORS 163A.030(1). In denying youth's petition, the juvenile court opined that youth had not proven by clear and convincing evidence that he is rehabilitated and does not pose a threat to public safety. Youth challenges the factual bases for that ruling and contends that the record did not support the juvenile court's ruling as a matter of law. The state contends that the juvenile court's findings are supported by the record and that we must therefore affirm.

As we explain in more detail below, the juvenile court may have failed to consider the factors in ORS 163A.030(8) in light of youth's current risk of reoffending. Absent *de novo* review, our review is limited to whether the juvenile court's explicit findings were supported by the record, but we exercise our discretion to review the record *de novo* in order to apply the legal principles outlined in *State v. A. R. H.*, 371 Or 82, 530 P3d 897 (2023), which the Supreme Court issued after the parties submitted their briefs in this case. On *de novo* review, we find that youth proved by clear and convincing evidence that he is rehabilitated and does not pose a threat to public safety that supports registration. *See* ORS 19.415(3)(b), ORAP 5.40(8)(c). Consequently, we reverse the juvenile court's order requiring youth to report as a sex offender.

We begin with the legal framework applicable to the hearing before the juvenile court. When a youth has been found to be within juvenile court jurisdiction for conduct that would constitute a felony sex crime if committed by an adult, the youth is required to report as a sex offender under ORS 163A.025(1). However, the juvenile court must "hold a hearing on the issue of reporting as a sex offender," before the youth is ordered to register, and in general, the hearing must be held in the six-month period before juvenile court jurisdiction is terminated. ORS 163A.030(1)(a); *see* ORS 163A.030(1)(b)(A) (timing).

If a youth is being supervised by the Oregon Youth Authority (OYA), at least 45 days before the hearing, unless

good cause is shown, OYA is required to file certain records and materials for the court's consideration at the hearing. OYA must provide the court with any sex offender evaluations and treatment recommendations in its possession regarding the youth, including any recommendations regarding the need for the youth to register in order to protect the public from future sex crimes. ORS 163A.030(10)(a)(A). OYA must also provide all polygraph examinations and records conducted by or for a treatment provider or OYA. ORS 163A.030(10)(a)(B).

At the hearing, the youth "has the burden of proving by clear and convincing evidence that [the youth] is rehabilitated and does not pose a threat to the safety of the public." ORS 163A.030(7)(b). In determining whether the youth has met that burden, the juvenile court may consider 18 factors under ORS 163A.030(8), though it is not limited to those factors. Broadly speaking, that statute identifies considerations related to pre-adjudicatory factors, such as the nature and circumstances of the youth's offense and the impact of the youth's conduct on the victim. It also identifies post-adjudicatory factors regarding the youth's accountability, performance on supervision, and participation in any sex-offender treatment.

When a youth has engaged in sex offender treatment, ORS 163A.030(8)(L) outlines four areas for consideration:

"(A)  The availability, duration and extent of the treatment activities;

"(B)  Reports and recommendations from the providers of the treatment;

"(C)  The person's compliance with court, board or supervision requirements regarding treatment; and

"(D)  The quality and thoroughness of the treatment program."

Additionally, the statute includes other potential considerations regarding the youth's engagement and support in the community, including the youth's school attendance, employment, and family support. Finally, the statute notes that the court may consider the "protection afforded the public by records of sex offender registration." ORS

163A.030(8)(r). The statute also expressly authorizes the juvenile court to consider "[a]ny other relevant factors." ORS 163A.030(8)(s).

Finally, if the juvenile court finds that the youth has not met the burden of proving by clear and convincing evidence that the youth is rehabilitated and does not pose a public-safety risk, "the court shall enter an order requiring [the youth] to report as a sex offender under ORS 163A.025." ORS 163A.030(7).

With that legal framework in mind, we begin with the facts that brought youth under the jurisdiction of the juvenile court in 2015. We then summarize the record of the evidence submitted during the hearings before the juvenile court in 2021.

In 2015, when youth was 12 years old, he admitted to sexually touching a six-year-old girl while at the local Boys and Girls Club. He and the victim did not know one another, and his conduct involved putting his hands down her underpants and touching her vagina several times, including after she communicated that she wanted him to stop.[1] The conduct to which youth admitted would constitute first-degree sexual abuse, ORS 163.427, if committed by an adult, and the juvenile court took jurisdiction based on youth's admission to that offense.

After youth completed extended residential and outpatient sex offender treatment, a hearing was scheduled to consider early termination of OYA and registration requirements. A hearing was held in March 2021, when youth was 18 years old, nine months after he had completed his treatment. We summarize below the materials that were considered by the court, including youth's psychological evaluations, polygraphs, and risk assessments.

In 2015, the juvenile court delayed disposition on youth's case until completion of a psycho-sexual evaluation on youth. After evaluation, Dr. Eric Johnson concluded that

---

[1] There was disputed evidence in the record that youth penetrated the victim's vagina during the incident. Youth was originally charged with first-degree sexual abuse as well as first-degree unlawful sexual penetration, which was dismissed when youth admitted to the sexual abuse charge.

there was no evidence to indicate that youth had more serious behavior problems or that he had a delinquent or antisocial orientation or hyperactivity that would indicate a risk of reoffending. To the contrary, Johnson reported that youth "displays good moral reasoning, he respects authority, he typically accepts responsibility for his behavior, and he is protective of his family and pets." Johnson concluded that youth's offense appeared to be an isolated incident, likely a product of curiosity and sexual experimentation, and that he was at low risk to reoffend, based on psychological testing as well as the ERASOR assessment tool.[2]

Johnson, who saw youth while he was in a several-week period of detention, recommended outpatient treatment and for youth to be returned home, and the juvenile court followed that recommendation. Youth was returned home and placed on 60 months' probation and required to participate in outpatient treatment. During his initial outpatient treatment, youth struggled a bit. His first mental health treatment provider was not a good match, and his attendance at weekly sessions with a second provider was inconsistent. He also struggled with completing assignments. He passed his first full disclosure polygraph in September 2017, indicating that he had not engaged in any further offending behavior. However, before the examination, he disclosed several additional behaviors that he had not discussed in treatment, including use of pornography as well as having sexual contact with a girl he considered to be his girlfriend. Those problems resulted in youth's commitment to OYA, and his placement in residential treatment at Cordero, which he began in October 2017.

Youth successfully participated in treatment at Cordero from October 2017 through January 2020. After a few months of treatment, when youth was 15 years old, he was referred for another psychological evaluation. Dr. Myco Van evaluated youth and concluded that youth did not have

---

[2] ERASOR (Estimate of Risk of Adolescent Sex Offense Recidivism) is a 25-item risk assessment tool that was commonly used in Oregon to assess risk that an adolescent will commit a new sex offense. In 2017, one of the original authors of the ERASOR, Dr. James Worling, developed and published the PROFESOR, as an alternative to the ERASOR. That assessment tool looks at protective and risk factors instead of solely focusing on risk factors.

a conduct disorder or psychosis but was affected by stressful experiences in his childhood. Van diagnosed youth with other specified trauma- and stressor-related disorder and other specified depressive disorder. He made recommendations for the focus of treatment based on youth's responses suggesting that he had "poor impulse control and [was] prone to have intense emotional outbursts" and was struggling with trauma, depression, and anxiety. Van recommended that youth continue in treatment focused on healthy sexuality, consent, and boundaries and other targeted treatment to address youth's mental health, impulsivity, and coping, along with peer relations.

During his time in residential treatment, youth had no major rule violations that were sexually offensive in nature. By early 2019, he had progressed to a treatment level that enabled him to attend Tigard High School, instead of Cordero's in-house educational program. Then, in March 2019, youth's clinical team learned that he was hiding a relationship with a female peer at the high school, and he was removed from unsupervised community outings, struggled to pass a maintenance polygraph, and was required to redo some assignments. Once he resolved his anxiety and was fully honest about his relationship, he rarely had behavioral struggles for the rest of his time at Cordero and, when he graduated, the program noted that he was a strong role model for his peers in following expectations.

Learning to take accountability for actions in the community was part of youth's treatment at Cordero, which aimed to address his tendency to focus on what went right and omit the whole truth. Youth was unable to have a direct clarification (a process in which an offender can provide the victim with information regarding the offense) with the victim and her family because the family was not willing to participate, so he was provided an opportunity to do a "walk-through" clarification.

In his discharge summary from Cordero, youth's clarification walk-through was described as "compassionate, empathic, polite, courageous, emotional and honest through the process." The program also noted that youth made progress regarding repairing his family relationships, building

better peer relationships, and improving his mental health goals. The program noted that, despite youth's struggles in early childhood, he appeared to have mental well-being and stability on par with most of his same-aged peers. He was noted to have acquired tools and resources to navigate the struggles regarding his mental health in the future. The program recommended that youth participate in outpatient treatment to assist in his transition home.

After returning home, youth successfully completed aftercare at J Bar J, with counselor, Matthew Griffith, from January through June 2020. His aftercare included passing an exit treatment polygraph which indicated that he had remained compliant regarding his probation requirements, having refrained from any sexually inappropriate conduct as well as from the use of any sexually explicit material. At the end of treatment, Griffith noted that youth demonstrated application of specific treatment tools with an emphasis on understanding his sexual offense cycle and the relapse prevention model. Griffith noted that youth "excelled in reintegrating back into the community"; he demonstrated the ability to establish age-appropriate peer relations through his high school, abstained from engaging in any violation behavior, and demonstrated appropriate impulse control.

Griffith used the Protective + Risk Observations for Eliminating Sexual Offense Recidivism (PROFESOR) to assess youth at the conclusion of aftercare treatment. The PROFESOR, a structured checklist, helps to identify and summarize protective, neutral, and risk factors for individuals aged 12 to 25 who have offended sexually and is designed to inform intervention goals. Out of the 20 factors in the PROFESOR checklist, youth was assessed as having 18 protective factors, two factors scored as neutral, and no risk factors. Thus, youth was assessed as "predominantly protective." In his discharge summary, Griffith concluded that there was no need for continued specialized intervention or supervision to assist youth "in developing healthy sexual relationships in the future and in preventing abusive sexual behavior."

McKague, youth's OYA probation officer, submitted an OYA sex offender registration hearing report in

November 2020. That report indicated that youth's successful completion of treatment demonstrated his willingness "to accept personal responsibility and accountability for his sexually offending behaviors." Also, no violations or "red flags" had been observed by OYA or Griffith. Further, passing his exit treatment polygraph with no red flags and continuing to meet for check-ins with McKague indicated compliance and accountability. There were no indications of drug or alcohol use before, during, or after youth's time in treatment. Protective factors identified included that youth had acquired employment, was enrolled in school, and had paid off his restitution.

During the March 2021 hearing, Collinson, youth's counselor at Cordero, testified that youth had always accepted responsibility for his offense and had never minimized his actions. Griffith, who worked with youth in his aftercare, testified and affirmed that youth had been assessed as low risk upon his discharge from aftercare in July 2020, but noted that he had not had recent opportunities to observe youth by the time of the hearing that would enable him to update that assessment. In response to a question regarding any concerns regarding unsupervised contact with children three years younger at a park or in a playground or babysitting, Griffith responded that, in his experience with youth, youth could manage an unsupervised visit at the park, but Griffith did not have experience with youth acting in a position of authority so he could not ascertain the level of risk for babysitting.

McKague testified that youth had been compliant on supervision and had done well. Thus, OYA was requesting early termination of his supervision and probation. OYA did not take a position on whether youth should be required to register. The victim's mother requested that youth be required to register until he could prove himself by more time in the community and on supervision. She testified that after the abuse, the victim "talked a little bit" with the family's pastor, did not suffer physical injury, and had more questions about sex compared to her other siblings.

At the end of the March hearing, the juvenile court deferred making a decision and scheduled a review hearing

in August "just to see what's gone on at school and give you some more time in the community to establish some additional factors for the court to consider."

At the August hearing, McKague and youth appeared and were the only witnesses. McKague reported that youth had graduated from high school and was working two days a week at a commercial cleaning company, spending time with friends, hanging out at home playing video games, and doing family activities. Things were "pretty low key" and "everything [was] going well." OYA still sought dismissal of the case and had no opinion on registration. When asked how often he was seeing youth, McKague responded that, given how long youth had been out with no violations of probation or law and no red flags, he was requiring only a self-report on the first of every month. He noted, in an exchange with the attorney for the state:

> "We heard testimony from both of his [treatment counselors] that [youth] has been assessed at low risk, which you will never—I wouldn't think we'd ever hear in court anybody say 'no risk' because I don't think it happens, but I think the reports we have—

> "* * * * *

> "[STATE]: Is—yeah, I think you're probably right about no evaluator is going to say there's no risk because in fact * * * Griffith said it's impossible to clearly assess potential danger in his report, right?

> "[McKAGUE]: Yeah, I think—I think we do the best we can. I mean, I think people—there's an assessment tool called the ERASOR, and I think recently we moved over to the PROFESOR, which looks at the protective factors and maybe risk factors.

> "And in [youth's] case, he was basically assessed as low, low risk because he presents with a lot of protective factors around the completion of residential sex offender treatment, outpatient treatment, passed polygraphs, and no further law violations or probation violations, those type of things.

> "So I think to his credit, he's been—he's done very well."

The court terminated youth's custody to OYA, resulting in one less year of probation, and acknowledged youth's successes, but explained its remaining concerns:

"[T]here's a number of factors in the statute that the Court can review, in [ORS] 163A.030(8). In looking at that, the Court's taking into consideration the nature of the act, the age of the victim and the age that you were at the time of the offense. In addition, statements made by the victim and parents of the victim in this case, as well as the additional factors in here of your psychological examinations, the testimony before the Court, the vulnerability of the victim as well, the extent and impact of the emotional injury on the victim.

"Based on that, the Court is finding that there is not clear and convincing evidence today that you're rehabilitated to the point that you don't pose a public safety threat.

"Therefore, the Court will order today that you be required to report as a sex offender under ORS 163A.025."

As noted, the Supreme Court issued its decision in *A. R. H.* after the parties filed their briefs in this case. That decision emphasizes five important aspects of the meaning and application of ORS 163A.030, which inform our review of this case. First, the court notes that the juvenile court's determination under ORS 163A.030(7)(b) is to be a factual "'finding' that the court is or is not persuaded 'that the [youth] is rehabilitated and does not pose a threat to the safety of the public.'" *A. R. H.*, 371 Or at 91. The statute assigns to the youth the burden of making the case for that finding by clear and convincing evidence. ORS 163A.030(7)(b).

Second, the court noted that the legislative history makes clear that "the 'threat to the safety of the public' with which the legislature was concerned was the threat that the youth will commit future sex offenses *** rather than a wider variety of generic threats." *A. R. H.*, 371 Or at 94.

Third, the court noted that "the proponents of the proposed changes to the reporting requirements for juveniles made clear their understanding that requiring an individualized 'threat' inquiry would 'retain registration only for those juvenile offenders who continue to be considered at relatively high risk to commit new sex crimes.'" *Id*.

at 95. Among the portions of the legislative history cited by the court were comments "describing the final bill as reflecting a 'good compromise,' with 'some youth who are considered low risk being able to avoid registration in the future, but still setting a fairly high bar before they can avoid that requirement.'"[3] *Id.*

Fourth, the court noted that, despite the extensive body of research and evidence that youth who complete sex offender treatment are at low risk of recidivism, the legislature did not create a statutory presumption favoring relief from registration for youth who have successfully completed treatment. *Id.* at 97-99. Instead, the court observed that both the text and the legislative history confirm that the juvenile court must make an individualized inquiry for each youth, with no particular factors entitled to greater weight. *Id.* at 98-100.

Finally, to the extent that a court's determination of youth's risk is based solely on preadjudicatory factors, there must exist a nonspeculative nexus to youth's current risk of recidivism; the court has an "obligation to distinguish between inferences that can reasonably be drawn from the evidence and inferences that are mere speculation." *Id.* at 104 (quoting *State v. Hedgpeth*, 365 Or 724, 732, 452 P3d 948 (2019)). As the court explained:

> "That standard means that we will not automatically affirm a finding that a youth's evidence is unpersuasive simply because the record contains evidence that the youth has engaged in concerning sexual conduct prior to adjudication.
>
> "As emphasized, the inquiry under ORS 163A.030(7)(b) focuses on the youth's current status, including all treatment to address the threat that the youth may once have presented. Thus, a youth's pre-adjudication conduct, alone, will support the court's finding only when there is a 'nonspeculative connection' between that pre-adjudication conduct and the youth's status at the time of the hearing under ORS 163A.030."

*Id.*

---

[3] *See* Audio Recording, Joint Committee on Ways and Means, Subcommittee on Public Safety, HB 2320, June 22, 2015, at 7:39 (comments of Mark McKechnie).

In the usual case, we will review for whether there is "any evidence in the record to support" the juvenile court's factual finding as to whether the youth can be relieved of the registration requirement. *Id*. at 95-96 (citations omitted). That is, "whether the juvenile court finds that a youth has proved—or not proved—by clear and convincing evidence that the youth is rehabilitated and not a threat to the safety of the public, the reviewing court accepts that finding unless the record required the juvenile court to answer that factual question in a different way." *Id*. at 96.

Here, youth contends that the juvenile court was required, on this record, to conclude that youth had met his burden. The state argues that the juvenile court's findings demonstrate that it diligently applied the statute and the correct legal standard of proof. Our review suggests some gaps in the juvenile court's findings that complicate our review.

First, it is not clear that the juvenile court considered the evidence of youth's current risk of recidivism. The court's findings did not reference post-adjudicatory factors regarding youth's treatment, rehabilitation, or current functioning, as anticipated in ORS 163A.030(8)(j) to (r), though significant evidence existed as to those issues. And though the court mentioned that it considered youth's psychological evaluations, it did not address how those evaluations, conducted in 2015 and 2017, spoke to a lack of rehabilitation or evidence of risk in 2021, when the hearing occurred. To the contrary, Johnson's report in 2015 indicated that youth was at "low risk" of reoffending and recommended outpatient treatment while living at home. In 2017, youth was moved to inpatient treatment, but not because he reoffended. Van's evaluation in 2017 recommended a course of treatment that was implemented at Cordero. Both evaluations suggested reason to believe that youth was amenable to treatment, and the course of youth's treatment and his successful completion of treatment bears out their predictions.

The juvenile court's findings otherwise noted only pre-adjudicatory factors regarding victim impact, statements from the victim and her family, youth's age, the victim's vulnerability, and the age difference between youth

and the victim. Those factors are among those anticipated by the statute, ORS 163A.030(8)(a), (b), (f), (g), and (i). However, as the court in *A. R. H.* emphasized, "a youth's pre-adjudication conduct, alone, will support the court's finding only when there is a 'nonspeculative connection' between that pre-adjudication conduct and the youth's status at the time of the hearing under ORS 163A.030." 371 Or at 104 (internal citation omitted). Here, the record suggests that the juvenile court may have denied youth's petition solely based on its consideration of preadjudicatory factors without a nonspeculative connection to his current status. Further, the psychological evaluations, also referenced by the court, do not clearly establish that connection, and the court did not otherwise offer one.

Moreover, the juvenile court's oral findings suggest that it may have denied youth's petition based on an impermissible standard of "no risk" rather than "low risk." As the Supreme Court recognized, however, the legislative history reflects an understanding that registration will be required only for those youth who continue to be at relatively high risk to commit new crimes, and an expectation that some youth who are considered low risk may avoid registration. *Id.* at 95. We take that to mean that the burden on youth to prove by clear and convincing evidence that he does not pose a threat to the safety of the public does not require him to meet a standard of "no risk." Indeed, such a finding is likely not achievable for any youth whose history may give rise to the registration requirement, since having committed an offense that would subject one to the registration requirement is itself a risk factor. Given the burden of registration, and without a sufficient basis to determine whether the trial court applied the factors consistently with the Supreme Court's observations in *A. R. H.*, we find that this is an exceptional case in which we choose to exercise our discretion to review *de novo* whether youth proved by clear and convincing evidence that he does not pose a threat to the safety of the public under ORS 163A.030(8). *See* ORS 19.415(3)(b) (allowing an appellate court discretion to review *de novo* an appeal from an equitable proceeding); ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record * * * only in exceptional cases.").

We begin with the relevant preadjudicatory factors relating to the nature of the offense and its impact on the victim.[4] As noted, the victim was six years old and the six-year age difference between youth and the victim made her particularly vulnerable. The incident took place in a public setting where youth was not in a position of trust or authority in relation to the victim. There was evidence that youth continued his conduct even after the victim asked him to stop, though there was no evidence that he used overt force or explicit threats. During an initial interview, the victim reported experiencing swelling and pain and expressed a fear of returning to the club where the incident happened. After the incident, the victim spoke to her pastor some but did not see a counselor. When asked about the emotional impact of youth's offense, the victim's mother explained that she did not see signs that the victim had been very affected by what happened. The victim's mother did, however, express concern about youth's level of continued risk given his lack of time in the community and her belief that youth's mother had minimized the seriousness of youth's conduct.

We next address actions youth has taken toward personal responsibility and accountability for his conduct.[5]

---

[4] ORS 163A.030(8) provides that the court may consider:

"(a) The extent and impact of any physical or emotional injury to the victim;

"(b) The nature of the act that subjected the person to the duty of reporting as a sex offender;

"(c) Whether the person used or threatened to use force in committing the act;

"(d) Whether the act was premeditated;

"(e) Whether the person took advantage of a position of authority or trust in committing the act;

"(f) The age of any victim at the time of the act, the age difference between any victim and the person and the number of victims;

"(g) The vulnerability of the victim;

"(h) Other acts committed by the person that would be crimes if committed by an adult and criminal activities engaged in by the person before and after the adjudication;

"(i) Statements, documents and recommendations by or on behalf of the victim or the parents of the victim[.]."

[5] ORS 163A.030(8) provides that the court may consider:

"(j) The person's willingness to accept personal responsibility for the act and personal accountability for the consequences of the act;

From the outset, youth admitted his wrongdoing. According to Johnson's evaluation in 2015, youth was able to explain why his behavior was wrong in that the victim was too young and the touching was not consensual. Youth admitted that he knew his actions were wrong immediately afterwards but explained that he had an uncontrollable urge and was acting on hormones. In later polygraphs, evaluations, and treatment settings, youth continued to work on taking accountability, understanding the impact on his victim, and making amends. Treatment notes and the discharge summary described youth's progress on rehabilitation as significant regarding victim empathy, establishing healthy sexual boundaries, understanding consent, and healthy, nondeviant sexuality. Although the victim and her family declined to participate in a clarification process, youth participated in a walk-through clarification process with Cordero staff who described him as empathetic and compassionate. Youth paid his court-ordered restitution using money he earned at Cordero and Thriftway.

We next address youth's participation in treatment and his compliance with supervision.[6] Although youth's initial outpatient treatment was not successful, he successfully completed an intensive 27-month residential treatment program at Cordero that involved seven treatment levels with

---

"(k) The person's ability and efforts to pay the victim's expenses for counseling and other trauma-related expenses or other efforts to mitigate the effects of the act[.]"

[6] ORS 163A.080 provides that the court may consider:

"(L) Whether the person has participated in and satisfactorily completed a sex offender treatment program or any other intervention, and if so the juvenile court may also consider:

"(A) The availability, duration and extent of the treatment activities;

"(B) Reports and recommendations from the providers of the treatment;

"(C) The person's compliance with court, board or supervision requirements regarding treatment; and

"(D) The quality and thoroughness of the treatment program;

"(m) The person's academic and employment history;

"(n) The person's use of drugs or alcohol before and after the adjudication;

"(o) The person's history of public or private indecency;

"(p) The person's compliance with and success in completing the terms of supervision;

"(q) The results of psychological examinations of the person[.]"

progressive stages of accountability and work. Despite some acknowledged setbacks, the program and McKague both commended youth for his significant progress, including in his management of impulsivity and emotional regulation and in other areas that would enable him to better manage and internalize changes regarding his mental health and his family and peer relationships. Youth followed through with all of Cordero's recommendations regarding outpatient treatment, including an assessment by Griffith to create an offense-specific treatment plan for five months of aftercare. Griffith explained that he used cognitive behavioral therapy in working with his clients and that he discussed with youth how he would address pornography; youth's final polygraph indicated that he had not used pornography. In aftercare, youth was at a point in his treatment that he was allowed to have a relationship, but he had not engaged in one. He participated in weekly sessions with Griffith over the five months of aftercare and, at trial, Griffith testified that youth had made further improvement and that he had no concerns about youth manipulating or grooming a younger child, though he would recommend adult supervision around younger children as a safety net for youth. Griffith assessed youth as low risk upon discharge and noted that youth's expressed sexual interest, apart from the index offense, was always age appropriate.

Throughout his six years under supervision, youth passed all of his polygraphs except one maintenance polygraph in March 2019 related to keeping secret his relationship with a peer at school. Treatment notes do not indicate any specifics as to how youth misrepresented the relationship, though some notes indicate that youth apparently became aroused when hugging the peer and focus on his lack of honesty about that as being the issue. Ultimately, treatment notes indicate that youth was truthful and passed all later polygraphs.

The discharge summaries for youth's treatment with Cordero and J Bar J reflect significant evidence of rehabilitation. Further, McKague had supervised youth for almost two years by the time of the final hearing, longer than his supervision of any other youth. None of the treatment

providers recommended that registration was necessary to protect the public. In the 19 months that youth had been living at home after residential treatment, there was no evidence of violations and no noted increase in youth's risk level. Youth was employed and did not use substances and did not reoffend during the six years of supervision.

On *de novo* review, we are persuaded that youth proved by clear and convincing evidence that he is rehabilitated and does not pose a threat to the community. The only testimony arguing in favor of registration was that of the victim's mother. The treatment providers did not urge that registration was necessary and, although youth's offense six years earlier was serious, his conduct under supervision consistently showed a pattern of taking responsibility, acquiring new skills, and applying what he learned in treatment. We do not discern a nonspeculative basis connecting his preadjudication conduct to a need to protect the public by requiring registration.

Accordingly, the juvenile court's order denying youth's petition for relief from registration is reversed.

Reversed.