434 June 26, 2024 No. 429

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of K. L. F.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

K. L. F.,
*Appellant.*

Jefferson County Circuit Court
00429713; A176472

Daina A. Vitolins, Judge.

Submitted April 20, 2023.

Erica Hayne Friedman and Youth Rights & Justice filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Eric Seepe, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.

JACQUOT, J.

Reversed.

Joyce, J., dissenting.

**JACQUOT, J.**

Youth appeals the juvenile court's judgment denying his petition for relief from registration as a sex offender. Youth assigns error to the juvenile court's finding that youth did not prove by clear and convincing evidence that he is rehabilitated and does not pose a threat to public safety. He challenges the factual bases for that ruling and contends that the evidence does not support the juvenile court's judgment. The state responds that the record supports the court's determinations and that we can only reverse if every reasonable court would be compelled to conclude otherwise. As we recently did, we elect to exercise our discretion to review this case *de novo* because, as explained below, the juvenile court applied an incorrect standard when assessing youth's risk of recidivism. *See State v. X. E. W.*, 331 Or App 1, 2, 13, 546 P3d 288 (2024). Reviewing *de novo*, we conclude that youth met his burden to prove that he is rehabilitated and that he poses a low risk of reoffending. We thus reverse the judgment of the juvenile court and grant youth relief from registering as a sex offender.

## I.   BACKGROUND

We begin by outlining the applicable law, then explain the procedural history of the case, and then turn to the evidence in the record about youth's rehabilitation.

### A.   *Legal Background*

When a youth has been found to be within juvenile court jurisdiction for conduct that would constitute a felony sex crime if committed by an adult, the juvenile court must hold a hearing to determine whether the youth must report as a sex offender. ORS 163A.030(1). At the hearing, the youth "has the burden of proving by clear and convincing evidence that [youth] is rehabilitated and does not pose a threat to the safety of the public" of committing future sex offenses. ORS 163A.030(7)(b); *State v. A. R. H.*, 371 Or 82, 95, 530 P3d 897 (2023).

If the youth is being supervised by the Oregon Youth Authority (OYA), OYA is required to submit materials for the juvenile court's consideration at the hearing.

ORS 163A.030(10)(a)(A). If the youth has undergone sex offender evaluations, OYA must submit the result of those evaluations and also provide a recommendation regarding the need for the youth to register as a sex offender in order to protect the public from future sex crimes. *Id*.

In addition to evidence of rehabilitation presented by the youth and the recommendation by OYA, the juvenile court may consider a litany of nonexhaustive factors provided by statute. ORS 163A.030(8)(a) - (s). Those factors include considerations about the youth before and after being adjudicated delinquent. *X. E. W.*, 331 Or at 3. The court may also consider "any other relevant factors." ORS 163A.030(8)(s). Additionally, if the youth has "participated in, and satisfactorily completed a sex offender treatment program," the juvenile court may consider four additional factors related to those programs. ORS 163A.030(8)(L). If the juvenile court is not persuaded that the youth met their burden to prove that they are rehabilitated and not a threat to public safety, then the court must order the youth to register as a sex offender under ORS 163A.025.

B.  *Procedural History*

In this case, youth was 13 years old when he was adjudicated delinquent for first-degree sodomy committed on a 10-year-old—an offense that would constitute a felony sex crime if committed by an adult. *See* ORS 163.405 (classifying first-degree sodomy as a Class A felony). The court imposed a restitution fee and ordered youth be committed to the custody of OYA until his 25th birthday.

In 2016, after youth turned 18 years old, OYA requested the juvenile court to terminate youth's commitment to the agency within the following six months. After holding a hearing as required by statute, the juvenile court denied OYA's request to terminate youth's commitment and ordered youth to register as a sex offender.

In 2018, OYA again requested the juvenile court to terminate the agency's authority over youth, and the court granted it without holding a hearing, releasing youth back into the community. The court required youth to continue registering as a sex offender based on its 2016 order.

Youth appealed, and we reversed because the court failed to hold a hearing within the time prescribed by statute and remanded for the court to hold another hearing on whether youth should continue registering as a sex offender. *State v. K. L. F.*, 301 Or App 666, 667, 456 P3d 376 (2020).

The juvenile court held a second hearing on youth's registration in 2021. The court again denied youth relief from sex offender registration. Youth appeals.

C. *Evidentiary Record*

With that legal and procedural background, we turn to the evidence that was before the juvenile court during that second hearing. Youth and the victim had known each other for a couple of years before youth assaulted the victim. The two played together and would occasionally spend the night at each other's houses. One night, youth spent the night at the victim's house and the two stayed up late to watch a movie. Youth began touching the victim's butt several times before pinning him down from behind and pulling his shorts and underwear down and attempting to insert his penis inside the victim's rectum. Youth expressed his desire for anal sex, but the victim told him no. Youth then sodomized the victim and continued over the victim's protests that he was in pain.

The victim reported feeling scared and confused after the assault. He stopped attending school because he felt embarrassed about what happened. He began having nightmares after the encounter, afraid that someone was outside of the house trying to get him; so, he began sleeping next to his mother to feel safe. The victim's parents noticed he began to have stomach issues and became more aggressive. They also reported that he began having trust issues and suicidal ideation and struggled with school and work. The victim graduated high school with a low GPA and was unable to hold down a steady job after graduation. He testified that he was unable to find resources to help him manage his increased aggression or to find peace in what happened, which led him to fight in school.

When the criminal investigation began, youth denied having sexually assaulted the victim and stated that

the victim lodged a false allegation out of spite. When asked if youth had the sexual encounter with the victim, youth responded, "that's just gross," but did not provide any further explanation as to why the victim would make the claim.

After being adjudicated delinquent for the crime, and while in OYA custody, youth participated in an offense-specific treatment program that helped him take responsibility for his actions. The treatment was a five-module program in which youth engaged in cognitive and behavioral therapy about his upbringing, the actions leading to the assault, and his actions moving forward. Youth stated that the therapy helped him control his impulses, taught him how to think before he acts, and helped him to mature. Youth also grew more empathetic and learned how to think about the impact of his actions on other people. He testified that he put those skills to use in standing up to a bully at school for someone else.

Part of the cognitive therapy included taking a polygraph where the polygrapher asked if youth had "any sexual assault victim that [youth] deliberately did not" mention and whether youth was "hiding any victims." Youth responded "no" to both questions; the polygraph did not reveal any physiological responses indicative of deception, and the polygrapher opined that youth was being truthful in his responses.

Another component of youth's treatment included a "clarification"—a process through which an offender can provide the victim with information regarding the offense. *X. E. W.*, 331 Or App at 6. Not every offender gets this opportunity, and those that do do not always talk with the victim. Youth's victim did not participate in the clarification process, but youth talked with the victim's mother. Youth described feeling stressed and scared leading up to the conversation but stated that it ended with both of them hugging and crying together.

Given that youth was not able to talk with the victim as part of the clarification process, youth wrote a letter to him. In that letter, youth took responsibility for the sodomy and called it a "terrible decision." Youth acknowledged

that the letter may be hard for the victim to read, and that it may cause anger. Youth recognized that his lying about the incident early on caused the victim and his family additional pain. Youth stated that the victim was courageous and brave in reporting the assault, and that he was not "wrong" in reporting it because it held youth responsible for his actions.

The victim felt as though the letter showed that youth was not rehabilitated. One sentence in the letter stated that youth "had been planning the entire incident, and [the victim] had no idea [about it] and when a time came for an opportunity to carry out [his] selfish desires, [youth] was only thinking about [himself]." Another sentence stated that youth was "actually glad" the victim reported the incident because the report "helped protect someone else by holding" youth responsible for his actions. Based on those sentences, the victim thought that youth should remain a registered sex offender. The victim expressed that the assault continued to impact him, and that it should continue to impact youth by remaining a registered offender. Despite what he had written in the letter to the victim, youth denied having "preplanned" the incident; he testified at the relief from registration hearing that he acted on impulse.

By the time of the 2021 hearing, youth was 22 years old, had graduated high school with honors, was engaged to his girlfriend of several years and had a child with her, had his own family home, and had started college at a local school. He testified that he did not use drugs or alcohol, other than the occasional beer. Youth also testified that he continues to employ the emotional regulation tactics he learned in his treatment program, such as reminding his coworkers that they need to think about how their actions will impact others before acting out. Youth had also paid off the restitution amount imposed by the court with his own money that he started making when he was released from OYA custody because he did not want his family to be stuck with the bill.

The OYA employee who supervised youth during the four-year supervision period, Kelly Braaten, testified that he requested the court to terminate OYA's custody over youth because youth's development and compliance with all

of the agency's requirements over four years of supervision meant that OYA had limited resources to provide for youth. Braaten noted that youth had been "diligent" in complying with all of OYA's requirements and did so at an "above average" completion standard. Braaten stated that youth did not have any major violations of his OYA terms and conditions; the only problem was that youth missed a week of calling Braaten with a status update on his life, but otherwise, Braaten did not see any "red flags" in youth that made Braaten question youth's conduct after being released from OYA supervision. Given youth's compliance, progress, and success in high school, Braaten testified that OYA supervision was no longer necessary. Braaten did not take a position on whether youth should be required to register as a sex offender.

## II.   TRIAL COURT RULING AND *DE NOVO* REVIEW

As noted earlier, the juvenile court denied youth relief from registering as a sex offender. The court, after considering the statutory factors, concluded that youth failed to show "by clear and convincing evidence that he is rehabilitated and presents no risk to the public." The court placed heavy weight on the violent nature of youth's crime and the impact on the victim. The court also expressed concerns regarding an apparent contradiction between youth's testimony that the assault was not premeditated and his letter to the victim that the crime was planned, about the length of time it took for youth to accept responsibility, and the absence of a psychological evaluation.

The juvenile court's order reflects that the court applied an incorrect legal standard when assessing youth's risk of recidivism. Specifically, the court's order indicates that the court held youth to the burden of proving that he "presents no risk to the public." After the trial court issued its order, the Supreme Court clarified that the standard to assess a youth's risk of reoffending is whether the youth presents a "low risk" of committing future sex crimes. *A. R. H.*, 371 Or at 95; *X. E. W.*, 331 Or App at 13("As the Supreme Court recognized, *** the legislative history reflects an understanding that registration will be required only for those youth who continue to be at relatively high risk to

commit new crimes."). That is, a youth does not have to prove that they are of "no risk" of committing another sex crime. *X. E. W.*, 331 Or App at 13. Therefore, the juvenile court here erred in applying a heightened standard of proof to youth's petition for relief from registration.

Having concluded that the trial court applied the wrong standard, we must determine how to proceed. We could remand the case to the juvenile court for that court to assess whether youth met his burden under the correct standard—the approach that the dissenting opinion would take. 333 Or App at 445 (Joyce, J., dissenting). We instead elect to exercise our discretion to try this case anew, as was the case in *X. E. W.*, 331 Or App at 13, another case in which the juvenile court applied the incorrect legal standard for recidivism. ORS 19.415(3)(b) (providing the court "sole discretion" to conduct *de novo* review); ORAP 5.40(8)(c) (limiting *de novo* review to "exceptional cases"). On *de novo* review, we conclude that youth met his burden to show by clear and convincing evidence that he is rehabilitated and not a threat to public safety.

### III.   DISCUSSION

For a youth to be relieved from the requirement of reporting as a sex offender, the youth must present "clear and convincing" evidence that the youth is "rehabilitated and does not pose a threat to the safety of the public." ORS 163A.030(7)(b). The Supreme Court recently explained that "the 'threat to the safety of the public' with which the legislature was concerned was the threat that the youth will commit future sex offenses * * * rather than a wider variety of generic" offenses. *A. R. H.*, 371 Or at 94. And a youth who is both at "low risk" of committing future sex crimes and meets their evidentiary burden shall be relieved from registration. *A. R. H.*, 371 Or at 95; ORS 163A.130(9)(a) ("When the person proves by clear and convincing evidence that the person is rehabilitated and does not pose a threat to the safety of the public, the court shall grant the petition.").

The critical focus under ORS 163A.030(7)(b) is "on the youth's status at the time of the hearing." *A. R. H.,* 371 at 88. Thus, a youth's preadjudication conduct alone will not

necessarily permit a finding that the youth has failed to prove by clear and convincing evidence that the youth met their statutory burden. *Id*. Similarly, a youth who has successfully completed treatment is not presumed to have met their burden. *Id*. at 98-99.

In this case, we are persuaded that youth proved by clear and convincing evidence that he is rehabilitated and poses a low threat to the public of committing future sex crimes. In so concluding, we place more weight on the post-adjudicatory factors than did the juvenile court. That is because, in the nearly 10 years between youth being adjudicated delinquent and the 2021 hearing on registration, youth has taken full "personal responsibility and accountability for his conduct," has not engaged in conduct that make us question his low risk of reoffending, and has otherwise been a productive member of his community. *X. E. W.*, 331 Or App at 14.

Youth's willing participation in and successful completion of an offense-specific treatment program while in custody demonstrates his earnest intention to accept personal responsibility for his actions and to absorb the impact youth's actions had on the victim. ORS 163A.030(8)(j), (L)(A). The treatment program was an extensive five-module program that lasted one year and four months in which youth learned to manage his impulsive behavior and regulate his emotions—and he is now passing those skills in emotional intelligence to the people around him. ORS 163A.030(8)(L)(A), (D).

As part of the treatment program, youth voluntarily participated in a clarification meeting with the victim's mother and talked through the incident in an open and honest manner, which demonstrates that youth was taking accountability for his actions. ORS 163A.030(8)(L)(A). Although the victim did not participate in the clarification meeting, youth was intent on expressing his regret for his actions by writing the victim a letter. ORS 163A.030 (8)(j), (L)(A). In the letter, youth acknowledged the pain he caused the victim, acknowledged that his conduct was a "terrible decision," and acknowledged that youth's lying about the incident early on caused additional pain for the victim. We recognize that youth did not admit to his conduct

until he was 14—several months after being adjudicated delinquent—but we view youth's willing and earnest participation in the treatment program as a demonstration that youth took responsibility for his actions and absorbed the impact he had on the victim. ORS 163A.030(8)(j), (L)(A).

After being released from custody, youth was placed under the supervision of OYA's Kelly Braaten who testified that he did not have any concern about youth being released back into the community given youth's diligent compliance with his OYA requirements and the absence of major violations of youth's OYA terms and conditions. ORS 163A.030(8)(L)(C). Indeed, OYA recognized youth's personal growth and sought termination of its custody over him twice.

By the time of the 2021 hearing, youth had paid off his restitution obligation with his own money, successfully held down and transitioned from a few part-time jobs into a full-time management role, graduated high school with honors and was enrolled in college, and maintained a healthy committed relationship with his fiancé and their child. ORS 163A.030(8)(m). Youth did not have any parole violations and continued to register as a sex offender in compliance with the juvenile court's 2016 orders. ORS 163A.030(8)(p). He did not use drugs and did not consume alcohol until he turned 21, at which point, he started having an occasional beer. ORS 163A.030(8)(n). The record does not show that youth engaged in public or private indecency, and there was no evidence presented that youth engaged in inappropriate sexual behaviors with his fiancé or child. ORS 163A.030(8)(o).

Youth did not submit evidence of a psychological exam, ORS 163A.030(8)(q), but he passed his sexual history polygraph exam which showed that youth was truthful in saying he only assaulted the victim and was not hiding any additional victims. ORS 163A.030(8)(j), (L)(A). And there is no evidence that youth committed other acts that would be criminal acts if committed by an adult. ORS 163A.030(8)(h). Those factors lead us to conclude that youth poses a low risk of committing future sex crimes.

We appreciate the factors relied upon by the juvenile court to deny youth relief from registration, and we do

not ignore them, but we are not persuaded that those factors foreclose youth's relief from registration. Those factors include the forceful nature of the act, ORS 163A.030(8)(b) - (c), evidence that the act may have been premeditated, ORS 163A.030(8)(d), and the long-lasting mental and emotional impacts on the victim, ORS 163A.030(8)(a), (i). With respect to the impact to the victim, we acknowledge and do not minimize that youth's crime caused the victim to feel confused and scared—feelings that turned into suicidal ideation, trust issues, and trouble at school and work. *Id*.

The juvenile court's ruling also relied on the determination that youth was in a position of trust and authority over the victim and that youth took advantage of that position in committing the act given that youth was three years older than the victim when the crime occurred. 163A.030(8)(e). We disagree with that determination in part. The record reflects that the victim's parents trusted youth to be with the victim unsupervised, but the record is silent on whether youth was in a position of authority over the victim. *Id*. The record does not reflect that the three-year age difference between youth and the victim rendered the victim particularly vulnerable given the children's relationship and development. ORS 163A.030(8)(g). Thus, we do not give significant weight to the age difference between youth and the victim on this record.

We also do not ignore the apparent conflict regarding whether youth premeditated the assault—he wrote in the letter to the victim that the act was planned and later testified that it was not—a fact that the juvenile court weighed against relief from registration. ORS 163A.030(8) (d). Ultimately, however, we are not persuaded that conflicting interpretations of youth's statements show that he will commit a similar act in the future. That is because, when taken together, the evidence shows that in the nearly 10 years between youth being adjudicated delinquent and the 2021 registration hearing, youth has taken full responsibility for his actions, has absorbed the impact he had on the victim, and has refrained from criminal activity—especially criminal sexual activity—while maintaining a stable family and job. OYA recognized youth's progress and low risk of reoffending as demonstrated by it seeking to terminate its

supervision of youth two times. All of this shows that youth has acted "toward[s] personal responsibility and accountability for his conduct," *X. E. W.*, 331 Or App at 14, and that he poses a low threat to the public of committing future sex crimes. ORS 163A.030(7)(b); *A. R. H.*, 371 Or at 95.

Accordingly, we reverse the judgment of the juvenile court denying youth's petition for relief from registration and relieve youth of registering as a sex offender in the future.

Reversed.

**JOYCE, J.,** dissenting.

I agree with the majority that, in light of the juvenile court's application of an incorrect legal standard, we must reverse the judgment. As the majority opinion correctly notes, the juvenile court assessed youth's risk of recidivism by focusing on whether youth proved that he was at "no risk" of committing future sex crimes. 333 Or App at 440. We now know that the proper standard is whether youth proved that he was at "low risk" of committing future sex crimes. *State v. A. R. H.*, 371 Or 82, 95, 530 P3d 897 (2023).

However, I disagree with the majority's conclusion that we should exercise our discretion to conduct *de novo* review. The juvenile court did not have the benefit of the Supreme Court's opinion in *A. R. H.* when it denied youth relief from sex offender registration in 2021, and that court is in a better position to conduct the type of factual review required in these cases. But perhaps more importantly, the parties have not briefed or otherwise addressed whether we should exercise *de novo* review. As we explained in *Dept. of Human Services v. R. F.*, 328 Or App 267, 274-75, 538 P3d 577 (2023), that should give us pause in conducting *de novo* review, because the respondent lacked notice and a fair opportunity to address the fact that we might be performing a much different function than when we review for evidentiary sufficiency. *Id.* In this circumstance, I would reverse and remand back to the juvenile court for it to determine youth's risk of recidivism under the correct legal standard.

For those reasons, I respectfully dissent.